744 F.2d 360
 UNITED STATES of America, Appellee,
v.
Thomas MANBECK, Appellant.
UNITED STATES of America, Appellee,
v.
Kenneth HERRING, Appellant.
UNITED STATES of America, Appellee,
v.
Mark Huiet SALE, Appellant.
UNITED STATES of America, Appellee,
v.
Lorenz Josephus PRODEN, Appellant.
UNITED STATES of America, Appellee,
v.
Kermit Theodore BROGDEN, Appellant.
UNITED STATES of America, Appellee,
v.
John Wesley FLANNEL, Appellant.
UNITED STATES of America, Appellee,
v.
Gary GALLOPO, Appellant.
UNITED STATES of America, Appellee,
v.
John Benjamin BARTON, Jr., Jessie Lee Mallory, and Arthur
Duncan, Appellant.
UNITED STATES of America, Appellee,
v.
John O'HARE, Eddie Brantley, Thomas Earnest Folske, Thomas
Sams Hightower, Timothy Allen Laxton, Harrell
Lewis, Jr., and John Isidore Stevens, Appellant.
UNITED STATES of America, Appellee,
v.
Aaron Douglas STAETTER, John Michael Iyoob, James Anthony
Hastings, and Gregory Michael Scott, Appellant.
UNITED STATES of America, Appellee,
v.
David Martin SUMMERVILLE, Appellant.
 Nos. 82-5090 L to 82-5100 L.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1983.
Decided Sept. 11, 1984.
 
 Rhonda A. Brofman, Atlanta, Ga. (Mark J. Kadish, Kadish & Kadish, P.C., R. David Botts, Atlanta, Ga., on brief), Michael L. Pritzker, Chicago, Ill. (Marcia L. Smith, Chicago, Ill., on brief), Edwin Marger, Atlanta, Ga. (Donald B. Walker, Atlanta, Ga., on brief), Arthur Howe, Charleston, S.C. (Paul N. Uricchio, Jr., Uricchio, Howe & Krell, P.A., Charleston, S.C., Robert G. Fierer, Atlanta, Ga., on brief), for appellants.
 Sara Criscitelli, Dept. of Justice, Washington, D.C. (Harry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.
 Before RUSSELL and PHILLIPS, Circuit Judges, and HOFFMAN,* Senior District Judge.
 WALTER E. HOFFMAN, Senior District Judge:
 Defendants appeal from a guilty finding at a stipulated facts trial on a multiple count indictment alleging various drug related charges. The twenty-two appellants were convicted of conspiracy to import marijuana in violation of 21 U.S.C. Sec. 963 (Count One), conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. Sec. 846 (Count Two), and importation of marijuana in violation of 18 U.S.C. Sec. 2, 21 U.S.C. Secs. 952(a) and 960 (Count Three). In addition to the three counts above, appellant Gary Gallopo was convicted of a fourth count, possession with intent to distribute marijuana in violation of 18 U.S.C. Sec. 2 and 21 U.S.C. Sec. 841(a)(1) (Count Four).
 Charges were originally brought against twenty-six defendants for a drug smuggling operation that occurred in November 1980. Three of the defendants pleaded guilty, and a fourth defendant, Robert John Manbeck, remained a fugitive throughout the trial. An extensive suppression hearing was completed on April 1, 1981. At that time all the remaining defendants, with the exception of Gallopo, waived their right to a trial by jury and submitted to a bench trial. The government and the defendants agreed to a stipulation adopting the record of the suppression hearing as the record of the case, subject to any objections filed. Gallopo stipulated to only part of the record, and his case followed the others. The court found all defendants guilty of all charges.
 Though the case below was a stipulated facts trial, the parties offer divergent renditions of the facts. Fortunately, the trial court rendered a lengthy narrative of the facts which we find to be a substantially complete representation of what was stipulated. The facts stated here will be a slightly condensed version of those described by the court. See United States v. Manbeck, 526 F.Supp. 1091, 1096-1100 (D.S.C.1981).
 At approximately 8:45 p.m. on November 26, 1980, Deputy Harold Canady of the Colleton County Sheriff's Department received a telephone call from his office advising him that an unidentified person had called the local fire department and stated that a truck was being loaded with marijuana at Bennett's Point, South Carolina. Canady and two other officers, Deputy Allen Beach and Deputy Earl Fowler, proceeded to Bennett's Point. All three arrived at approximately 9:30 p.m., Canady and Beach in one car and Fowler in another. Canady and Beach proceeded on to the landing, while Fowler checked some vehicles parked on the road leading to the landing.
 At the landing, Officers Canady and Beach first observed a tractor-trailer backed up between a shrimp house and the dock. Canady recorded the number of the Georgia license plate on the tractor-trailer. The two officers then observed a white "U-Haul type" truck parked in the parking lot next to the landing, and recorded its Georgia license plate. A brown "econoline-type" truck with Georgia license plates was also observed at the scene, parked facing the tractor-trailer behind the shrimp house. In addition, the officers observed a shrimp boat named the "Hazel B" docked at the south dock. No individuals were observed in the area at this time.
 After notifying Colleton County Sheriff John Siegler of their observations, Officers Canady and Beach proceeded to check out another known drug smuggling site referred to as the "Wiggins area." Officer Fowler remained to maintain a surveillance point on Bennett's Point Road at the entrance to the landing. Finding nothing unusual at the Wiggins area, the two officers went to a location known as the "Brickyard Bridge" which was on the only road that runs from U.S. Highway 17 to Bennett's Point. Upon arriving at Brickyard Bridge, Officers Canady and Beach received a radio call from Officer Fowler advising that the tractor-trailer had departed Bennett's Point landing. Officer Seigler radioed Officers Canady and Beach and directed them to stop the tractor-trailer at the intersection of Bennett's Point Road and U.S. Highway 17.
 Officers Canady and Beach proceeded down the road about one mile ahead of the tractor-trailer, while Officer Fowler followed the vehicle from behind. At the designated intersection, Officer Canady positioned his patrol car to block the road. When the tractor-trailer--a Peterbilt tractor with the name "Polar Transportation" on its door--arrived, Officer Canady went to the driver's side and asked the driver, defendant Kenneth Brogden, to step out of the vehicle. Brogden stepped out and, on request, produced his driver's license and registration. He also provided Officer Canady with a bill of lading which indicated that the tractor-trailer was carrying a load of lard from a Charleston business named "Central Soya." While the officers ran a check, Brogden was placed in the patrol car because the weather that evening was cold and rainy. Officer Canady then radioed Sheriff Seigler and provided him with an up-dated report of the situation and gave him the information from the bill of lading. Meanwhile, Officers Canady and Beach elicited from Brogden that he was at Bennett's Point visiting a friend. When asked where he was keeping his tractor-trailer truck parked, Brogden's response conflicted with what the officers had previously observed at Bennett's Point. When asked about when he had left Charleston Brogden responded that he had left two days before but had become ill and stayed in a motel room for some time before proceeding to Bennett's Point. Sheriff Seigler subsequently radioed officers Canady and Beach and informed them that he could not locate any company in Charleston with the name shown on the bill of lading provided by the driver.
 Sometime soon thereafter, Officer Fowler, who had arrived at the scene, told Officers Canady and Beach to get out of the patrol car and come to the back of the trailer. Upon approaching the rear of the trailer, the officers smelled an extremely strong odor of what they believed to be marijuana coming from the back of the trailer. Brogden was then placed under arrest for possession of marijuana and searched and handcuffed.
 While the Peterbilt tractor and trailer were being removed from the scene, Officer Canady spotted a second tractor-trailer coming from Bennett's Point. As it approached, Canady observed that it was a Ford tractor-trailer that bore Georgia license plates and, like the Peterbilt, carried the name "Polar Transportation" on its door. The tractor-trailer stopped and, as before, the odor of marijuana was detected coming from the trailer. Deputy Fowler immediately placed the driver of this second tractor-trailer, Donald Bohanon, under arrest.
 Officers Canady, Beach, and Fowler, and others on the scene, then proceeded to organize a convoy to move the seized vehicles and contraband to Walterboro. As the convoy proceeded toward Walterboro, Officer Robinson, who had remained at the scene of the arrest with Bohanon radioed the convoy and told them to stop moving because Bohanon had informed Officer Robinson of the presence of a third tractor-trailer at Bennett's Point landing. When Officers Canady and Beach turned around to head back to the landing area, they saw the two vehicles previously observed at the landing, the white "U-Haul" type truck and the brown van, stalled in traffic behind the tractor-trailer. Both vehicles were stopped by the officers. Officer Beach approached the white truck and asked the driver, David Summerville, who was the sole occupant of the truck, to step out and show his driver's license. As Summerville handed over his license, Officer Beach detected the odor of marijuana on him. Summerville was immediately placed under arrest. The two occupants of the brown van, Mark Sale, who was driving the van, and Lorenz Proden, who was a passenger, were also arrested.
 Thereafter, at about 3:30 a.m., Sheriff Seigler arrived on the scene and he and Officers Canady and Beach headed towards Bennett's Point landing. The officers observed that it was quiet and no other vehicles were present. A second trawler, the "Billy B," was now at the dock beside the "Hazel B." The three also observed what appeared to them to be lights coming from some type of vessel out on the water. They could not determine whether the lights were coming toward the dock or going away.
 After checking the area and finding nothing, the three officers made contact with an officer of the U.S. Customs Patrol. The Customs officer was briefed as to what had occurred. Officers Canady, Beach, and Fowler then left the scene in order to obtain search warrants for the four vehicles. While at the Magistrate's residence, the officers received a call from the dispatcher informing them that Customs had picked up a vessel. Deputies Beach and Fowler immediately departed to assist Customs officials with the people aboard the vessel.
 Customs Patrol Officers testified during the suppression hearing as to the developments which led to the arrest of the defendants found on board the two shrimp trawlers, the "Mary and John" and the "Lady Lisa."
 Customs Patrol Officers had patrolled the St. Helena Sound area for two to three weeks prior to the evening of November 26th and had not observed any boats in the area. On the evening of November 26th, Customs Patrol Officer McDonald was apprised of the situation at Bennett's Point and, at approximately 3:00 a.m., he directed a Customs vessel to proceed down the Ashepoo River to see what could be located. Prior to sending this vessel out, Officer McDonald and others heard the sound of a diesel engine in the area of Bennett's Point which, according to McDonald, sounded as if it were going out the Ashepoo. Thereafter, at approximately 3:30 a.m., several Customs Patrol Officers left their location some twelve or thirteen miles from Bennett's Point in a twenty-seven foot Customs vessel and headed for Bennett's Point. Upon reaching the end of the Ashepoo River, at approximately 4:00 a.m., they observed lights from what appeared to be two vessels in the St. Helena Sound. The Customs Patrol approached and circled the anchored vessels, recorded their names, and ran a systems check on them. That check indicated that the vessels were suspected of involvement in drug smuggling.
 The Customs Patrol Officers identified themselves and, after a request, were given permission to board the "Lady Lisa" by the captain. The spokesman told the Customs Patrol that he was from Thunderbolt, Georgia, and had eight people aboard. Because of the strong winds and high seas the officers had great difficulty in pulling alongside the vessel. The Customs Patrol Officers decided not to board at that time for safety reasons and the spokesman aboard the "Lady Lisa" agreed to follow the Customs vessel back into the Ashepoo to be boarded. The captain of the "Mary and John" informed Customs that he was coming from Charleston and going to St. Augustine with four people aboard. He also agreed to follow the Customs vessel back into the Ashepoo, and proceeded behind the "Lady Lisa."
 As the Customs vessel led the two trawlers in, the officers observed that although the captain of the "Lady Lisa" had earlier stated that he was not familiar with the waters, he headed for deeper water whenever the Customs vessel was running into shallow water. In addition, no shrimp nets were observed aboard the vessels when the vessels were initially approached.
 The vessels were taken to the dock at Bennett's Point at approximately 6:30 a.m. Customs Patrol Officers, officers from the Colleton County Sheriff's Department, and State Law Enforcement Division (SLED) agents were at the dock and secured the vessels. Customs Patrol Officers Shepard and McDonald boarded the "Mary and John" and discovered that nine people were aboard instead of the expected four. In addition, the vessel was now completely rigged with shrimp nets. Upon entering the fishhold, they observed what appeared to be marijuana residue. The crew members of the vessel were then given their Miranda warnings and placed under arrest at approximately 7:00 a.m. Those arrested aboard the "Mary and John" were John Wesley Flannel, Arthur Duncan, Jesse Mallory, John Benjamin Barton, Jr., James Anthony Hastings, Gregory Michael Scott, Aaron Douglas Staetter, John Michael Iyoob and Robert Charles Michael.
 Customs Patrol Officers Settles and Sheriden boarded the "Lady Lisa" and gathered the crew in the cabin. Settles observed that the deck appeared to have been recently hosed down. He then climbed down into the fishhold and smelled and observed residue of what he believed to be marijuana. He also noticed the absence of any fish or ice on the vessel. The men aboard the "Lady Lisa," Thomas S. Hightower, John Isidore Stevens, Harrel Lewis, Jr., Timothy Allen Laxton, Thomas Ernest Folske, Eddie Brantly and John O'Hare, were given their Miranda rights and placed under arrest.
 On the dock itself, investigating officers found bales of marijuana on the concrete and conveyor belts. The bales of marijuana had tags attached to them, and one of the same type tag was found in plain view on the deck of the "Lady Lisa."
 On November 27, 1980, warrants signed by Magistrate Wood to search the Peterbilt tractor-trailer, the white "U-Haul" type truck, the brown van and the Ford tractor-trailer were executed under the direction of Sheriff Seigler. Quite a few bales of marijuana were discovered in each of the trailers being pulled by the Peterbilt and Ford tractors and in the "U-Haul" type truck. The total amount of marijuana found in these three vehicles was later calculated to be 59,100 pounds. In addition, numerous items were discovered in the brown van, including a wallet containing identification of defendant Staetter (arrested on the "Mary and John") and a red pad containing numerous notations.
 In their appeal from the district court's findings, appellants raise the following issues: whether the indictment should have been dismissed because of alleged discrimination in the selection of the grand jury foreman; whether the trial court erred when it granted the government's motion to Nolle Prosequi Count Four of the Indictment; whether the trial court erred when it failed to suppress evidence discovered during a search which took place after the defendants were unlawfully seized and arrested; whether the trial court misconstrued the stipulations, and thereby erred when it overruled defendant's objections to certain evidence; whether there was sufficient evidence to support the convictions.
 The multitude of defendants in this case renders it prudent to divide them into separate categories. This court will utilize the clear separation already provided by the arguments submitted on behalf of three distinct groups among the defendants, each group represented by their own brief.
 The first group is made up of the defendants who were on land while transporting the marijuana, Sale, Proden, Brogden and Summerville, and of the defendants who participated in the smuggling operation but were not at the scene at that evening, T. Manbeck and Herring. Bohanon, driver of the second tractor-trailer, became a witness for the government.
 The second group of defendants is comprised of those defendants arrested on board the two trawlers, Flannel, Duncan, Mallory, Barton, Hastings, Scott, Staetter, Iyoob, Hightower, Stevens, Lewis, Laxton, Folske, Brantly and O'Hare. Robert Charles Michael, who was on board the "Mary and John," also became a witness for the government.
 The last group is made up of one defendant, Gallopo, who was arrested sometime after the incident on information from participants that he was the driver of a third tractor-trailer on the scene that evening.
 The first two groups present identical issues for appeal except as to the third issue, in which the first group argues that the evidence seized from the land vehicles should be suppressed, while the second group argues that the evidence seized from the trawlers should be suppressed. Defendant Gallopo presents only one issue, that there was insufficient evidence to support his conviction. Because of this substantial overlap, all the parties will be treated together except when their respective positions dictate separation.
 * The trial court found that defendants had established a prima facie case of discrimination against blacks and women in the selection of grand jury forepersons and deputy forepersons. United States v. Manbeck, 514 F.Supp. 141, 147-150 (D.S.C.1981).[1] However, in an excellent and thoroughly reasoned opinion, the trial court also concluded that the presumption of discrimination created by this prima facie showing was adequately rebutted by proof of an absence of discriminatory intent. Id. at 145-150.[2]
 In the interim period between the trial court's decision and the hearing of this appeal, the Fourth Circuit rendered an opinion, United States v. Hobby, 702 F.2d 466 (4th Cir.1983), affirmed, --- U.S. ----, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), which controls the disposition of this issue. Like appellants here, defendants in Hobby sought a dismissal of their indictment and a reversal of their convictions on the grounds of discrimination in the selection of grand jury forepersons. Denying the relief requested, this Court held that a federal grand jury foreperson has only ministerial duties that cannot meaningfully affect the rights of persons charged with crime. Id. at 470-471. The Supreme Court affirmed Hobby, concluding that the due process clause is not violated in light of the ministerial functions of the grand jury foreperson, and that the equal protection clause does not protect a white male from the discriminatory exclusion of blacks and women.
 The record in this case is devoid of any information regarding defendants' respective sex or race. Having thus failed to establish the requisite basis for a claim, there is no need to examine the merits underlying appellants' argument. This issue is resolved against appellants.
 II
 After the suppression motions were heard, but before trial in this case began, the government moved to dismiss Count Four of the indictment, which had charged defendants with the possession of marijuana with intent to distribute. The government admits that Count Four was dismissed so that pending state charges on the same crime would not be precluded. Code of Laws of South Carolina Sec. 44-53-410 bars state prosecution for the same offense once jeopardy has attached in the federal action.[3]
 Defendants argue that this dismissal was improper under either of two grounds.[4] The dismissal of an indictment under Fed.R.Crim.P. Rule 48(a) requires leave of the presiding court.[5] Courts have held that by including the phrase "leave of court" in Rule 48(a), "the Supreme Court intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice." United States v. Cowan, 524 F.2d 504, 512 (5th Cir.1975), cert. denied sub nom. Woodruff v. United States, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).[6] Defendants argue that the trial court abused its discretion because dismissal was not in the public interest as it violated the public policy expressed in Code Section 44-53-410 against successive state prosecutions and went against the Justice Department's Petite policy prohibiting duplicitous state-federal prosecutions.[7]
 
 
 1
 Alternatively, defendants argue that trial had begun in this case, and thus, consistent with express dictates of Rule 48(a), consent of the defendants was needed before Count Four could be dismissed.[8] Although the case had not yet been formally called to trial when the Count was dismissed, defendants contend that, because the record of the prior suppression hearing was stipulated to as the record for trial, jeopardy had attached and trial had commenced before dismissal occurred.
 
 
 2
 Both arguments are highly imaginative, but neither is persuasive. To the extent that there may be a general policy against successive federal-state prosecutions for the same crime,[9] the fact that this policy is not followed in a given case does not automatically establish that the public interest was violated. Supreme Court decisions upholding the validity of duplicitous federal-state prosecutions have recognized that there are situations where the public interest is furthered by allowing these authorities to both pursue cases, regardless of whether such efforts later turn out to be duplicitous. See Rinaldi v. United States, 434 U.S. at 28, 98 S.Ct. at 84; Bartkus v. Illinois, 359 U.S. at 137, 79 S.Ct. at 685; Abbate v. United States, 359 U.S. at 195, 79 S.Ct. at 670. South Carolina may very well have had substantial reasons for wishing to prosecute defendants and there is nothing in the record that indicates otherwise.[10]
 
 
 3
 The Supreme Court has established that a trial court's discretion to deny the government's motion to dismiss an indictment is limited to situations where dismissal is "clearly contrary to manifest public interest." Rinaldi v. United States, 434 U.S. at 30, 98 S.Ct. at 86, quoting United States v. Cowan, 524 F.2d at 513; United States v. Perate, 719 F.2d 706 (4th Cir.1983); see also, United States v. Hamm, 659 F.2d 624, 628-632 (5th Cir.1981). This Court cannot conclude on the basis of the record presented that the trial court abused its discretion when granting the government's motion to dismiss.[11]
 
 
 4
 Defendants' argument that jeopardy had attached and trial had begun before dismissal, because the record of the suppression hearing was stipulated to, is equally unavailing.[12] The Supreme Court has repeatedly emphasized that "[b]oth the history of the Double Jeopardy Clause and its terms demonstrate that it does not come into play until a proceeding begins before a trier 'having jurisdiction to try the question of the guilt or innocence of the accused.' " Serfass v. United States, 420 U.S. 377, 391, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 (1975) (citations omitted). Count Four was dismissed by pretrial motion on grounds unrelated to the merits of the case, and before the question of the guilt or innocence of defendants was before the court. See Serfass v. United States, 420 U.S. at 391-92, 95 S.Ct. at 1064-65; United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). Accordingly, jeopardy had not attached, the trial had not begun, and Rule 48(a) did not require defendants' consent for dismissal of Count Four.
 
 
 5
 Finally, for the alleged violation of Rule 48(a), defendants request the extraordinary remedy of a reversal of the convictions on the counts for which they were tried. However, prejudice to defendants by the dismissal of Count Four is limited to exposure to state criminal liability on that Count, which exposure has already occurred. The remedy for a wrongful dismissal of a count of an indictment would be a reinstitution of that count or a separate reindictment on the same charge.[13] But if defendants are again indicted on Count Four, the Justice Department's Petite policy would be directly implicated by the intervening state prosecution. Then, in all likelihood, the government would again move for dismissal, and it would probably be granted. To this extent, circumstances have rendered this issue moot. In either case, defendants are denied the relief requested.
 
 III
 
 6
 A. SUPPRESSION OF EVIDENCE FROM THE MOTOR VEHICLES
 
 1. Standing
 
 7
 Before the validity of the search and seizures may be considered, it must first be resolved which of the defendants has standing to raise the claimed violations.
 
 
 8
 i. Peterbilt Tractor-Trailer. The trial court held that defendants Herring, Proden, Summerville, Sale, and the driver of the Peterbilt, Brogden, all had standing to challenge the search and seizure of the Peterbilt. Brogden had a privacy interest sufficient to be entitled to standing because the tractor-trailer was entrusted to his care. The other four defendants had standing, according to the trial court, because "[a] sufficient showing was made as to their interest in the marijuana seized so as to warrant the finding that they had a reasonable expectation of privacy in the Peterbilt tractor-trailer and its contents." United States v. Manbeck, 526 F.Supp. at 1100. Defendants established their interest in the marijuana through testimony that the smuggling operation was a joint venture and each of the defendants had an undivided possessory interest in the profits to be made from the sale.
 
 
 9
 This Court finds that defendants Herring, Proden, Summerville, and Sale should not have been granted standing to challenge the search of the Peterbilt.[14] The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found. Rawlings v. Kentucky, 448 U.S. 98, 104-106, 100 S.Ct. 2556, 2561-2562, 65 L.Ed.2d 633 (1980); United States v. Salvucci, 448 U.S. 83, 91-93, 100 S.Ct. 2547, 2552-2554, 65 L.Ed.2d 619 (1980); United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).[15] As Rawlings made clear, ownership of the item seized is, by itself, insufficient to confer a privacy interest in the area searched. At most, an interest in the items found may be a factor considered when deciding whether there is a privacy interest in the area searched. Rawlings v. Kentucky, 448 U.S. at 105-106, 100 S.Ct. at 2561-2562; United States v. Salvucci, 448 U.S. at 91-92, 100 S.Ct. at 2552-2553. See also Rakas v. Illinois, 439 U.S. 128, 149-150 n. 17, 99 S.Ct. 421, 433-434 n. 17, 58 L.Ed.2d 387 (1978).[16] Defendants have not submitted any other persuasive evidence of a privacy interest in the tractor-trailer.[17] Consequently, only Brogden has standing to challenge the search of the Peterbilt.
 
 
 10
 ii. Ford Tractor-Trailer. The trial court held that none of the defendants had standing to challenge the search and seizure of the Ford tractor-trailer. The driver of the Ford, Bohanon, became a government witness and testified that he consented to the search. For the reasons stated above, this Court agrees with the determination of the trial court.
 
 
 11
 iii. White "U-Haul Type" Truck. The trial court held that no one, not even driver Summerville, had standing to challenge the search and seizure of the White "U-Haul type" truck. Summerville did not testify at the suppression hearing, other indicia of an expectation of privacy in the truck itself were not submitted, and the ownership of the truck was never clearly established. Thus, none of the defendants satisfied their burden of showing a legitimate expectation of privacy in the truck, and none have standing to challenge its search and seizure. See United States v. Lochan, 674 F.2d 960, 963-65 (1st Cir.1982).
 
 
 12
 iv. Brown Van. The trial court held that only driver Sale had standing to challenge the search and seizure of the brown van. The passenger, Proden, was denied standing because he failed to establish any interest that would support an expectation of privacy in the van. There is evidence that shows Sale was given lawful and exclusive possession and control over the van, and with it he was entitled to an expectation of privacy therein. See United States v. Dickerson, 655 F.2d 559, 561 (4th Cir.1981). Conversely, Proden could only show that he was a passenger in the van with the permission or acquiescence of Sale. This showing alone is insufficient to vest Proden with an expectation of privacy in the van. See Rakas v. Illinois, 439 U.S. at 148, 99 S.Ct. at 433. Only Sale has standing to challenge the search and seizure of the brown van.
 
 2. Search and Seizure of the Motor Vehicles
 
 13
 Defendants' basic argument is that the search and seizure of the Peterbilt was illegal, and the subsequent searches of the other vehicles were tainted by this initial illegality. In conjunction, defendants argue that Brogden was subject to a custodial interrogation without first having been given the requisite Miranda warning, which failure likewise served to taint the searches and seizures that followed. The legality of the search and seizure of the Peterbilt and the detention of Brogden must therefore be resolved first.
 
 
 14
 i. Peterbilt Tractor-Trailer. Defendants argue that although the stop of the Peterbilt may have been supported by a reasonable suspicion,[18] the length of time Brogden was detained (45 minutes to 1 hour) exceeded the time limit for a permissible Terry stop and thereby became a de facto arrest. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defendants rely upon Sharpe v. United States, 660 F.2d 967 (4th Cir.1981), vacated and remanded, 457 U.S. 1127, 102 S.Ct. 2951, 73 L.Ed.2d 1345 (1982), modified, 712 F.2d 65 (4th Cir.1983), cert. granted, --- U.S. ----, 104 S.Ct. 3531, 82 L.Ed.2d 837 (1984), for the proposition that an investigatory stop may only be brief and certainly less than the time span in this case.
 
 
 15
 Defendants' reliance on Sharpe is misplaced. Although defendants are correct that Sharpe emphasized the limited and brief nature of a permissible Terry stop, Sharpe also noted that after the initial, brief questioning, "any further detention or search must be based on consent or probable cause." Sharpe v. United States, 660 F.2d at 970, quoting United States v. Brignoni-Ponce, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Here, unlike in Sharpe, the officers were provided with probable cause well within the confines of any brevity requirement.[19]
 
 
 16
 An officer has probable cause for arrest when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Recently, the Supreme Court held that the existence of probable cause is to be judged by the "totality of the circumstances," and added that even anonymous tips may provide the basis for probable cause where there are other indicia of reliability. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 2328-2336, 76 L.Ed.2d 527 (1983). The officers who detained Brogden were aware of the anonymous phone tip informing that marijuana was being smuggled at Bennett's Point. This tip was supported by the reputation of the area and the unusual presence and activity of the tractor-trailer, and by Brogden's unlikely description of his activities and the fact that his answers contradicted some of the earlier observations made by the officers while at Bennett's Point landing.[20] Within approximately fifteen minutes of the stop Sheriff Seigler informed the officers that the company listed on the bill of lading provided by Brogden, "Central Soya," did not exist.[21] Combined with the facts previously known to the officers, there was sufficient information to lead a reasonably prudent man to believe that Brogden was participating in a marijuana smuggling operation. These developments served to elevate the reasonable suspicions of the officers to probable cause justifying an arrest. Thus, assuming, arguendo, that a de facto arrest occurred by virtue of the length of the detention, such arrest was not illegal because probable cause arose before a de facto arrest can be posited.
 
 
 17
 This finding alone, however, does not conclusively resolve that Brogden was properly detained. In contrast to the length of a detention, the quality or nature of a detention may also exceed the limits of a Terry stop.[22] In other words, the way in which Brogden was detained or "seized" while the officers conducted their investigation might have been so serious an intrusion on his personal liberty that it required probable cause for arrest.
 
 
 18
 Some confusion exists in the area of warrantless detentions because there are "seizures" of a person which are limited and need only a reasonable suspicion, as in Terry v. Ohio,[23] and there are "seizures" of a person which are so restrictive that they are indistinguishable from an arrest and require probable cause, as in Dunaway v. New York.[24] Both kinds of seizures involve detentions where the person detained is not technically free to leave while the officer pursues the investigation, but they differ in degree. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 1324-1325, 75 L.Ed.2d 229. Which of these two types of seizures has occurred can only be identified by examining the characteristics of each particular detention in view of permissible Terry stops, and by comparing the seizure to the essential attributes of a formal arrest. See Florida v. Royer, 103 S.Ct. at 1325-1326; Michigan v. Summers, 452 U.S. at 700, 101 S.Ct. at 2593 (1981); Dunaway v. New York, 442 U.S. at 215, 99 S.Ct. at 2258 (1979).
 
 
 19
 The manner in which Brogden was initially stopped poses no problem. This Court has already rejected the notion that officers transform a Terry stop into an arrest by virtue of blocking the progress of a vehicle and drawing their weapons when approaching. See United States v. Perate, supra; United States v. Seni, 662 F.2d 277, 283 (4th Cir.1981) cert. denied, 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982). The former is a reasonable way of effectuating the stop of a motor vehicle, and the latter is a justified safety precaution.
 
 
 20
 However, the placing of Brogden in a patrol car is more problematic.[25] The government argues that the officers could not let Brogden remain in the cab of the tractor, potentially allowing him access to weapons or providing him with a means of escape. Furthermore, the inclement weather made it unreasonable to detain Brogden anywhere else but in the patrol car. Once in the patrol car, the government contends, it was a proper safety precaution to ask Brogden to keep his hands in clear view on the back of the front seat.
 
 
 21
 As the Supreme Court has stated, "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention." Florida v. Royer, 103 S.Ct. at 1328. The problem arises because Brogden was placed in a patrol car. This, of course, is not an ideal location for the purposes of an investigatory detention. The undisputed facts show that, to their credit, the officers had no feasible alternative. This court refuses to recognize a rule that all detentions in a patrol car are per se arrests. Indicia associated with arrest are often identified by their restrictive or coercive nature, and, admittedly, there are certain inherently coercive aspects to being placed in a patrol car; but the Terry doctrine allows police officers the use of "a number of devices with substantial coercive impact on the person to whom they direct their attention, including an official show of authority, the use of physical force to restrain him, and the search of the persons for weapons." Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 1862, 75 L.Ed.2d 903 (1983) (citations omitted). In this case, the coercive and restrictive aspects of Brogden's detention were unavoidable.[26] Similarly, ordering Brogden to keep his hands in view was purely a safety precaution and was less intrusive than a frisk which, under Terry, the officers were fully entitled to do.
 
 
 22
 This case is unlike Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), where the defendant was subject to threats and abuse, and unlike Dunaway v. New York, supra, where the defendant was transported to the police station and placed in an interrogation room. Brogden was not informed that he was under arrest; the officers did not believe that they had arrested him; and he was not frisked or handcuffed. Brogden was removed from the cab for safety reasons and placed in the only available shelter--a police car. In short, except for this unavoidable happenstance, the manner in which Brogden was detained lacks most of the trappings of a formal arrest and is fully consistent with an investigative stop. Balancing the nature and quality of the seizure with the importance of the government's interests, and taking into account that this was the least intrusive means to effectuate the investigative stop, this Court finds the officers' conduct to be a permissible Terry detention--at least until probable cause arose--and not an arrest. See United States v. Place, 103 S.Ct. at 2642-2643 (balance nature and quality of intrusion against the governmental interests); Florida v. Royer, 103 S.Ct. at 1325 (least intrusive means reasonably available).[27]
 
 
 23
 The foregoing conclusion also goes a long way towards addressing defendants' claim that the search and seizure was tainted because Brogden's right against self-incrimination was violated.[28] All of the pertinent statements made by Brogden came within the first fifteen minutes of his detention.[29] Thus, the inquiry must focus on these first fifteen minutes.
 
 
 24
 Miranda safeguards are implicated only when a suspect is subjected to interrogation in a custodial setting. Miranda v. Arizona, 384 U.S. 436, 477-478, 86 S.Ct. 1602, 1629-1630, 16 L.Ed.2d 694 (1966); United States v. Stanley, 597 F.2d 866, 867 (4th Cir.1979). This Court finds that the failure to give Brogden the Miranda warning when he was placed in the patrol car did not violate his Fifth Amendment rights because he was not subjected to a custodial interrogation when the statements in question were made.
 
 
 25
 We have already concluded that the detention of Brogden was not a seizure amounting to an arrest. Although this finding is not necessarily dispositive of the custody issue, "[t]he question of what constitutes a 'seizure' of a person under the fourth amendment is quite similar to the determination of 'custody' triggering rights under the fifth amendment." Moore v. Ballone, 658 F.2d 218, 226-227 (4th Cir.1981).[30] The same basic factors are examined in both inquiries, except that focus for the purposes of custody is more squarely placed on the coercive nature of the environment. The reason for detaining Brogden in the patrol car--specifically, the inclement weather--derogates from whatever coercive elements are otherwise normally attendant thereto. In addition, Brogden was not formally placed under arrest, nor frisked or handcuffed[31], nor was he threatened, pressured, or abused. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Likewise, Miranda warnings are not required simply because one is questioned in a police car. Applying the objective standard,[32] this Court finds that Brogden was not in "custody" when questioned by the officers.[33] Therefore, Brogden's Fifth Amendment rights were not violated by the failure to immediately give him a Miranda warning and there was no taint of the search and seizure of the Peterbilt.
 
 
 26
 In summary, the initial stop of the Peterbilt, supported by a reasonable suspicion based on articulable facts, was proper under Terry and its progeny. The manner in which Brogden was detained did not exceed the type of seizure allowed by Terry, and probable cause arose before the brevity requirement was violated. Thus, even assuming that a de facto arrest occurred, the arrest was not illegal. Finally, Brogden was not the subject of a custodial interrogation when the statements in question were made. The motions to suppress evidence gained through the stop of the Peterbilt, and the detention of Brogden, were correctly denied.[34]
 
 
 27
 ii. Ford Tractor-Trailer, White "U-Haul Type" Truck, Brown Van. This Court previously concluded that none of the defendants had standing to challenge the search and seizure of the Ford and the "U-Haul Type" truck, and that only Sale had standing to challenge the search and seizure of the brown van. Even considering defendants' arguments, however, their motions to suppress the evidence obtained from these vehicles were properly denied. Defendants' primary argument, that the illegal seizure of the Peterbilt and Brogden tainted searches and seizures which followed, is foreclosed by the foregoing determination that there was no such illegality. Thus the validity of each stop must be examined on its own merits.
 
 
 28
 The facts known to the officers at the time provide ample justification for the stop of each vehicle. As with the Peterbilt, the Ford tractor-trailer came from the direction of Bennett's Point Landing, it bore a Georgia license plate, and it carried the "Polar Transportation" logo on its door. Soon after the Ford was stopped, the officers detected the odor of marijuana and its driver was placed under arrest. Both the "U-Haul Type" truck and the brown van were recognized as the vehicles observed earlier by the officers while at Bennett's Point Landing. They were stopped, and, again, the odor of marijuana was detected and the occupants were placed under arrest. There can be no serious challenge to the validity of the searches and seizures of any of these vehicles.
 
 B. SUPPRESSION OF EVIDENCE FROM THE VESSELS
 
 29
 1. Standing.
 
 
 30
 The trial court granted standing to challenge the searches of the "Mary and John" and the "Lady Lisa" to defendants Flannel and Hightower, respectively, because they were the captains of each ship and asserted sufficiently protectable privacy interests in their vessels. No other defendant was granted standing to challenge the searches of these vessels. Defendants argue that all of the persons on board the vessels were entitled to standing, not because of a privacy interest, but rather, due to the fact that all of the defendants were arrested prior to the actual search of the vessel and before probable cause had arisen. According to defendants, this prior illegal arrest rendered the later searches illegal.
 
 
 31
 Defendants should have been granted standing to argue that the detention was by operation of law equivalent to an illegal arrest. It is axiomatic that the Fourth Amendment protects against the unreasonable seizure of persons as much as it protects against unreasonable searches. See, e.g. Dunaway v. New York, supra. Insofar as standing is implicated, however, the inquiries are different. While a person owning or possessed of an object searched is not always entitled to standing to challenge that search, a person claiming to be the victim of an illegal arrest is the one most entitled to challenge that arrest.
 
 
 32
 Of course, here, defendants are challenging the search and seizure of the vessels, not the arrests per se. Nevertheless, their argument, relying on Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), gives defendants standing to challenge whatever may have been tainted by the primary illegality--in this case their arrest--once that illegality is established. See United States v. Sharpe, supra. An illegal arrest does not preclude the prosecution of the arrestee, nor does it usually vitiate a subsequent conviction. See United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). Thus, most claims of illegal arrest are made in furtherance of a motion to suppress evidence allegedly tainted by that illegal arrest. If all such motions are denied on the grounds of a lack of standing as to the subject of the taint, defendants raising these claims will be left without a remedy, and whatever deterrent that now exists against the exploitation of an illegal arrest will be eliminated.
 
 
 33
 We conclude that all of the crew members should have been granted standing to challenge the legality of their arrests. United States v. Demanett, 629 F.2d 862, (3d Cir.1980) cert. denied, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); see also United States v. Glen-Archila, 677 F.2d 809, 817 n. 6 (11th Cir.) cert. denied, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982). This Court also finds, however, that the trial court's failure to do so was harmless error. The trial record reveals that the two defendants granted standing, Flannel and Hightower, were allowed by the trial court to argue the very position asserted by the crew members who were denied standing: that the initial detention and seizure of the boat and its crew was improper and amounted to an illegal arrest. We also take notice of the identity of interests between the crew and the captains, and of the fact that at least a few of the crew shared counsel with Captain Hightower. Thus, even though officially denied standing, the crew was effectively allowed to argue for the existence of the primary illegality and no prejudice was suffered by them as a result of the denial. Cf. Halderman v. Pennhurst State School and Hospital, 612 F.2d 131 (3rd Cir.1979) (wrongful denial of intervention is harmless error because party participating argued same position as party excluded); Lang v. Cone, 542 F.2d 751, 754 (8th Cir.1976) (harmless error where case developed fully anyway). The trial court's error was therefore harmless, and does not provide a basis for a reversal.
 
 
 34
 2. Search and Seizures of the Vessels.
 
 
 35
 Defendants argue that the Customs officials exceeded their authority for a limited document check under 19 U.S.C. Sec. 1581(a); that since Sec. 1581(a) was exceeded, the officers needed probable cause to board the vessels; and finally, that they were arrested prior to docking at Bennett's Point Landing, and in any event, before there was probable cause for arrest.
 
 
 36
 The trial court held that the Customs officials, supported by a reasonable suspicion of a customs violation, properly hailed and boarded the vessels, and properly detained the persons aboard as a safety precaution while securing each ship. Then, after their plain view observations, the officers had probable cause to conduct a more detailed search, all of which culminated in the arrest of defendants. We agree with the conclusions of the trial court.
 
 
 37
 The gravamen of defendants' position is that the Customs officials' authority to board under Sec. 1581(a) was exceeded. For the purposes of this appeal, the parties essentially agree that the boarding was not conducted as a document inspection, but was instead a stop to investigate the suspected participation of these vessels and their crew in a marijuana smuggling operation. Recently--while upholding the validity of section 1581(a) in the context of a suspicionless boarding for the inspection of documents--the Supreme Court noted that "[s]ection 1581(a) provides Customs officials with authority beyond boarding for document inspections." United States v. Villamontez-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 2575 n. 2, 77 L.Ed.2d 22 (1983). Section 1581(a) reads in pertinent part:"Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters ... and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."
 
 
 38
 The language of this statute imparts an obviously broad grant of authority to Customs officials, and evidently draws no distinction between the boarding of a vessel for a documents inspection and the boarding of a vessel for an investigative stop. In Villamontez-Marquez, the Supreme Court declined to resolve whether the latter may likewise be validly conducted without suspicion. Id. 103 S.Ct. at 2575 n. 2. Some guidance was provided, however, when the Court reiterated that "no Act of Congress can authorize a violation of the Constitution." Id. at 2578, citing Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Thus, there can be little doubt that Sec. 1581(a) must be interpreted in a manner consistent with limitations imposed by the Fourth Amendment.
 
 
 39
 This Circuit has on several occasions considered the justification needed when a Section 1581(a) boarding is conducted for more than a document inspection. See, e.g., Blair v. United States, 665 F.2d 500 (4th Cir.1981); United States v. Watkins, 662 F.2d 1090 (4th Cir.1981); see also, United States v. Helms, 703 F.2d 759 (4th Cir.1983) (boarding for document inspection, but includes discussion of investigatory stops). Unfortunately, the large number of cases and the distinctions upon which they rest have created a morass of precedent that has persistently defied attempts at clarification of this area of the law.
 
 
 40
 The case law draws three apparent distinctions between the type of justification necessary for the valid detention of a vessel. Depending on the circumstances surrounding each stop, probable cause might be required, see United States v. Laughman, 618 F.2d 1067 (4th Cir.) cert. denied, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980); or a reasonable suspicion may be sufficient, see, Blair v. United States, supra, and United States v. Watkins, supra; or no suspicion at all may be needed, see, United States v. Harper, 617 F.2d 35 (4th Cir.); cert. denied, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).
 
 
 41
 Laughman applied the probable cause test because the boarding in that case "was justified by the probable cause-exigency exception to the warrant requirement." United States v. Laughman, 618 F.2d at 1973 n. 5. Throughout the disposition of the case, the detention was examined in the context of a full-fledged search, not as a limited investigatory stop. The Court expressly limited its holding by noting that other rationales might support the boarding which require something less than probable cause, citing, inter alia, the border search described in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); an investigatory stop under United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); and a boarding for document checks and safety under 19 U.S.C. Sec. 1581(a). See United States v. Laughman, 618 F.2d at 1072 n. 2, 1073-1074 n. 5.
 
 
 42
 Blair required a reasonable suspicion because, absent allegations that a vessel detained in inland waters had previously crossed the United States territorial border, the more liberal standards used for border investigatory stops were inapplicable. See United States v. Blair, 665 F.2d at 505. We found that most other circuits faced with the seizure of a vessel in inland waters without sufficient evidence of a border crossing applied the reasonable suspicion standard. Id. Watkins rested on the reasonable suspicion standard because the presence of a reasonable suspicion in that case satisfied the traditional investigatory stop requirement and made it unnecessary for the court to determine whether a lesser justification would have sufficed. United States v. Watkins, 662 F.2d at 1095-1096.
 
 
 43
 Finally, Harper allowed the suspicionless stop of a vessel, pursuant to authority similar to Sec. 1581(a), 14 U.S.C. Sec. 89(a), because it was a limited non-discretionary intrusion of the type discussed in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). United States v. Harper, 617 F.2d at 38-39.
 
 
 44
 In summary, the precise issue presented by this case--finding the minimum applicable standard for an investigatory stop, conducted under the authority of Sec. 1581(a), made on inland waters where there is evidence of a territorial crossing--has not been resolved in this Circuit. Believing it imprudent to decide so significant an issue where such determination is not necessary for the outcome of the case, this Court also chooses to reserve the question of the minimum basis upon which an investigatory stop under Sec. 1581(a) may be upheld.
 
 
 45
 The Customs officers had ample support for a reasonable suspicion that the vessels detained had participated in a drug smuggling operation. At the time the two ships were stopped, the Customs officers were aware of the fact that marijuana was believed to have been unloaded at Bennett's Point Landing earlier in the evening; a Customs officer testified that he had observed no vessels in St. Helena Sound for the preceding two to three weeks, so the presence of these trawlers was somewhat unusual; no shrimp nets were observed on the trawlers; and a systems check run on the vessels indicated that they might be involved in drug smuggling activities.
 
 
 46
 Supplied with this information, the officers were fully justified in making an investigatory stop. Where vessels are involved, because of the nature of detentions at sea, an investigatory stop may properly include a boarding of the detained vessel by the Customs officers. Blair v. United States, 665 F.2d at 506. After attempting to pull alongside the vessel, and being unable to accomplish this due to strong winds and high seas, the Customs officers decided not to board for safety reasons and asked that the ships follow the Customs vessel back into the Ashepoo. As was discussed in a previous section, where dictated by safety reasons, an investigatory stop may entail moving the detained party from one location to another. See United States v. Demanett, 629 F.2d 862, 865 (3rd Cir.1980) (vessel moved to calmer waters before boarding). Relying heavily on "the important factual differences between vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area," the Supreme Court has acknowledged that the Fourth Amendment "reasonableness" requirement allows certain greater intrusions in vessel stops than might be permitted in land vehicle stops. United States v. Villamontez-Marquez, 103 S.Ct. at 2579-2580. The blind application of Fourth Amendment doctrines developed in other contexts ignores the inherent exigencies which accompany vessel stops, and threatens to proscribe a significant range of government activities that are necessary and reasonable under the circumstances. Accordingly, despite the two hour journey,[35] this Court concludes that Customs officials were entitled to escort the vessels to Bennetts' Point Landing in order to effectuate a safe and practical investigatory stop. See United States v. Demanett, supra; United States v. Zurosky, 614 F.2d 779, 790 (1st Cir.) cert. denied, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980).
 
 
 47
 On the way to Bennetts' Point, Customs officers noted that the trawlers were navigated in a manner that indicated familiarity with the surrounding waters even though earlier the captains had denied such knowledge. Customs officers also observed that while there were no shrimp nets displayed on the trawlers when first approached, by the time they reached port the nets were completely rigged.
 
 
 48
 Once on board, the officers detained the occupants of these vessels as a safety precaution.[36] Reasonable force, including the use of weapons, is permissible for the protection of officers conducting an investigatory stop, and does not transform the detention into an arrest. See United States v. Warren, 578 F.2d 1058, 1070 (5th Cir.1978) (gathered crew under armed guard); see also United States v. Seni, supra; Michigan v. Summers, supra. The officers boarding the "Mary and John" immediately discovered nine persons instead of the four acknowledged by the captain. Also, the officers on board the "Lady Lisa" observed that the deck appeared to have been recently hosed down so as to erase any residue of marijuana. Combined with the information previously known to the officers, these observations provided probable cause to conduct a further search. See, e.g. United States v. Watkins, 662 F.2d at 1094 (wash deck of marijuana residue). The exigent circumstances concomitant to the mobility of a vessel justified the search without a warrant. United States v. Helms, 703 F.2d at 766; United States v. Hensler, 625 F.2d 1141, 1142 (4th Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). Upon entering the fishhold of each vessel the officers smelled and observed the residue of marijuana,[37] and noticed the absence of fish or ice. Only after this sequence of events transpired did the officers place the crew under arrest, supported fully by probable cause. There being no Fourth Amendment violations, we conclude that the motions to suppress were properly denied.
 
 IV
 
 49
 Defendants argue that the trial court made four errors on its evidentiary rulings: the testimony of Michael and Bohanon should have been suppressed as fruit of illegal arrests; said testimony should have been excluded under Federal Rules of Evidence 801(d)(2)(E) as it was uncorroborated testimony of a co-conspirator; statements made by defendants to Agent Sprague should not have been permitted into evidence; the testimony of Agent Stein should not have been allowed.
 
 
 50
 Defendants' first claim is resolved against them by virtue of the foregoing determination that there were no illegal arrests. In the absence of a primary illegality there can be no taint. This Court also notes that the exclusion of live-witness testimony because of an alleged taint is not freely allowed. See United States v. Ceccolini, 35 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The testimony of Michael and Bohanon was properly admitted.
 
 
 51
 On defendants' second claim, the trial court noted that it "was provided with no specific objection as to what part of [Bohanon's] testimony defendants objected to." United States v. Manbeck, 526 F.Supp. at 1109. Nevertheless, the Court opined that "the government introduced sufficient independent evidence of the conspiracy and of all defendants' participation therein." Id. This finding precludes any Rule 801(d)(2)(E) objection to the testimony of Bohanon and Michael.
 
 
 52
 Defendants argue that Agent Sprague interviewed them in violation of their right to counsel. The trial court held that the statements were voluntarily made by defendants and made after a Miranda warning was given to each upon their entry into the interrogation room. Id. at 1111. The record supports the conclusions of the trial court.
 
 
 53
 Finally, defendants object to the admission into evidence of a transcript of Agent Stein's testimony in a prior drug case. This prior transcript was admitted into evidence as expert witness testimony on the packaging of Columbian marijuana. The trial court found that when this transcript was stipulated to as evidence no defendant raised any objection. Again, the record supports the trial court.
 
 
 54
 We find no errors in the trial court's evidentiary rulings.
 
 V
 
 55
 The last issue advanced by defendants is that the evidence adduced at trial was insufficient to support their convictions. The sufficiency of evidence in support of a conviction is to be examined in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 8 L.Ed. 680 (1942). The trial court gave an exhaustive accounting of the proof relative to each defendant which indicated their guilt beyond a reasonable doubt. See United States v. Manbeck, 526 F.Supp. at 1111-1116. After reviewing the record, this Court adopts and incorporates herein that portion of the trial court's opinion. Moreover, except as discussed below with regard to Count Two, this Court affirms the convictions of all defendants as well supported by the evidence.[38]
 
 A. IMPORTATION
 
 56
 Defendants were found guilty of the importation of marijuana. The essential element of this crime is that the marijuana must have been brought or introduced into the territory of the United States from some place outside thereof. See 21 U.S.C. Secs. 951(a), 952(a). Defendants claim that this element has not been established. To establish guilt of the crime of importation there must be proof that the defendants in some manner participated in or helped effectuate the act of importing. United States v. Seni, 662 F.2d at 285-286. This proof may be made through use of circumstantial evidence, and need not be based on direct testimony of an observed territorial crossing. See United States v. Watkins, 662 F.2d at 1098; United States v. Phillips, 664 F.2d 971, 1033 (5th Cir.1981), cert. denied sub. nom., Platshorn v. United States, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).
 
 
 57
 Courts have held that evidence of the foreign origin of the marijuana is a factor to be considered in showing importation but is not sufficient of itself. United States v. Watkins, 662 F.2d at 1098; United States v. Seni, 662 F.2d at 285. Courts have also held that the size of the ship and the quantity of the marijuana alone are not enough to prove importation. Id. at 287; United States v. Soto, 591 F.2d 1091, 1104 (5th Cir.) cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979).
 
 
 58
 In addition to the considerations specified above, however, the facts in this case include the existence of a navigational chart found in front of the steering wheel of the "Lady Lisa" which was marked so as to indicate a path of travel extending deep into customs waters. Cases where such a map has been found, in conjunction with other factors (including those previously mentioned as well as other considerations involved here like the absence of a shrimping activity on a shrimp boat), almost unanimously conclude that there was sufficient evidence to prove importation. See, e.g., United States v. Seni, supra; United States v. Moorman, 660 F.2d 106 (4th Cir.1981); United States v. Saimiento-Rozo, 676 F.2d 146 (5th Cir.1982); United States v. Escobar, 674 F.2d 469 (5th Cir.1982). The same conclusion prevails in the present case. There is ample proof of each element on the crime of importation to support the conviction of all defendants on that count.
 
 B. CONSPIRACY COUNTS
 
 59
 There has been considerable debate recently concerning the evidence necessary to convict members of a crew on board a vessel laden with marijuana of conspiracy to possess said marijuana with intent to distribute. See, e.g., United States v. Michelena-Orovio, 719 F.2d 738 (5th Cir.1983) (en banc reversal), cert. denied, --- U.S. ----, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984). This debate invariably arises in the circumstance where crew members are separately charged with both conspiracy to import marijuana and conspiracy to distribute marijuana. Many courts have grappled with the distinction between these two conspiracies.
 
 
 60
 The essence of the crime of conspiracy is an agreement to engage in a criminal act. United States v. Peterson, 524 F.2d 167, 174 (4th Cir.1975) cert. denied, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); see also Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). To convict a defendant of conspiracy the government must establish the defendant's knowledge of and participation in the conspiracy. United States v. Laughman, 618 F.2d at 1075. The elements of knowledge and participation may be proven by circumstantial evidence. Glasser v. United States, 315 U.S. at 80, 62 S.Ct. at 469.
 
 
 61
 With respect to a conspiracy to import, courts have agreed that a crewmember's knowledge of the presence of marijuana may be inferred if there is a large quantity on board. United States v. Alfrey, 620 F.2d 551, 556 (5th Cir.), cert. denied, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). Likewise, participation is established where there is some evidence of the crew's affirmative role in the conspiracy. The facts of this case easily fulfill both prerequisites. The large amount of marijuana found, over 50,000 pounds, makes it extremely unlikely that the crew was unaware of its cargo. The crew's participation was established by Michael's testimony that all of the crew members manned the vessels and helped off-load the marijuana.[39] Michael also testified that some time during the off-loading a sum of money was distributed among the persons on board the "Mary and John," and that the entire crew of the "Mary and John" helped wash the ship and string up shrimp nets while being escorted back to Bennett's Point. All of this evidence, combined with the inference that--in the absence of evidence to the contrary--the crew was aware of its point of origin and general destination, is sufficient to support the convictions of the crew of joining a conspiracy to import. See United States v. Laughman, supra; United States v. Alfrey, supra.
 
 
 62
 This conclusion does not, however, end the inquiry.[40] Defendants were convicted of two separate conspiracy counts: conspiracy to import marijuana in violation of 21 U.S.C. Sec. 963; and conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. Sec. 846. Thus, their knowledge of and participation in both conspiracies must be proved.
 
 
 63
 The Supreme Court has confirmed that a defendant may be convicted of a conspiracy to import marijuana and a conspiracy to distribute marijuana on the basis of the same evidence and punished cumulatively for these convictions without violating the Double Jeopardy clause. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1980). In satisfaction of the Blockburger test, each statutory offense requires proof of a fact which the other does not. See Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Conviction of a conspiracy to import does not require proof of the existence of a subsequent plan for distribution; and a conviction of conspiracy to distribute need not include proof of a preceding act or plan of importation.
 
 
 64
 In Albernaz, defendants were charged on a single conspiracy count with dual objectives--"a conspiratorial agreement which envisages both the importation and distribution of marijuana." Albernaz v. United States, 450 U.S. at 336, 101 S.Ct. at 1140. "Congress has in effect determined that a conspiracy to import drugs and to distribute them is twice as serious as a conspiracy to do either object singly." Id. at 343, 101 S.Ct. at 1144; see United States v. Marotta, 518 F.2d 681, 685 (9th Cir.1975). In contrast to Albernaz, the crew members here were charged with two separate conspiracies. In view of the fact that the events which gave rise to these charges have evolved from a single continuous transaction, this Court will examine the case with the understanding that defendants were engaged in a single conspiracy with dual criminal objectives, much like the charge in Albernaz. United States v. Marotta, 578 F.2d at 684-685; United States v. Burkett, 612 F.2d 449 (9th Cir.1979), cert. denied, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 853 (1980); cf. American Tobacco Co. v. United States, 328 U.S. 781, 787-788, 66 S.Ct. 1125, 1128-1129, 90 L.Ed. 1575 (1946). We do not understand the government to be arguing, by virtue of the separate counts, that two distinct and separate conspiracies were entered into by the crew. See, e.g., United States v. Marotta, supra. To convict the crew members of both conspiracies, then this Court must find that they entered into a conspiratorial agreement that encompassed distribution as well as importation.
 
 
 65
 In response to the conspiracy to distribute charge, the crew members contend, arguendo, that their only role was bringing the marijuana onto shore, and they had no interest or stake in whatever followed. Although this Court has never directly ruled on the necessary intent, other Circuits have held that the government must show both general criminal intent and specific intent to distribute when a defendant is charged with a conspiracy to distribute. United States v. Russell, 703 F.2d 1243, 1244 (11th Cir.1983), citing United States v. Pope, 561 F.2d 663, 670 (6th Cir.1977). Moreover, the degree of criminal intent must be at least that necessary for the substantive offense itself. United States v. Malatesta, 590 F.2d 1379, 1381 (5th Cir.), cert. denied, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); see also Ingram v. United States, 360 U.S. at 678, 79 S.Ct. at 1319. The crew members argue that, at most, the evidence supports an inference that they engaged in a conspiracy to import, but there is no evidence to support an inference that they joined a conspiracy to distribute.
 
 
 66
 Defendants' position is, of course, eminently reasonable. Other courts have found defendants guilty of a conspiracy to import, and not a conspiracy to possess with intent to distribute, where it appeared that their only role was to bring the contraband into the country. See, e.g., United States v. Hawkins, 661 F.2d 436, 452-453 (5th Cir.1981), cert. denied, 459 U.S. 832, 103 S.Ct. 72, 74 L.Ed.2d 71 (1982) (pilot only indicted and found guilty of conspiracy to import; persons meeting plane indicted and found guilty of conspiracy to possess with intent to distribute); United States v. Rodriguez, 585 F.2d 1234, affirmed in pertinent part, 612 F.2d 906 (5th Cir.1980), overruled in pertinent part, United States v. Michelena-Orovio, 719 F.2d 738 (5th Cir.1983); United States v. Cadena, 585 F.2d 1252 (5th Cir.1978), overruled in pertinent part, United States v. Michelena-Orovio, 719 F.2d 738 (5th Cir.1983).
 
 
 67
 In Michelena-Orovio, supra, however, the Fifth Circuit appears to have taken a contrary position. The defendant in Michelena-Orovio was a crew member who argued that there was insufficient evidence to support a finding that he had joined the conspiracy to distribute. Like the crew members in this case, Michelena-Orovio argued that his role was limited to effectuating the importation. The Fifth Circuit rejected this contention, pointing out that "Michelena-Orovio was an actual participant in at least a segment of the distribution scheme since he was a member of the conspiracy to import marijuana". United States v. Michelena-Orovio, 719 F.2d at 749. The Fifth Circuit stopped short of relying on the doctrine that one who joins a part of a conspiracy is culpable for the entire conspiracy, presumably because that rationale would revive the spectre of double jeopardy which was dispelled by the Supreme Court in Albernaz. Wherein, the Supreme Court concluded that the Blockburger test was satisfied because "[s]ections 846 and 963 specify different ends as the proscribed object of the conspiracy--distribution as opposed to importation--it is beyond peradventure that 'each provision requires proof of a fact [that] the other does not.' " Albernaz v. United States, 450 U.S. at 333, 101 S.Ct. at 1139. Therefore, one guilty of a conspiracy to import cannot, by virtue of that fact, automatically be guilty of a conspiracy to distribute.
 
 
 68
 Instead, the Court found Michelena-Orovio guilty of joining the conspiracy to distribute solely on the inferences drawn from the fact that a large quantity of marijuana was imported. The Court reasoned that where there is more marijuana that a person can consume, "someone must have an intent to distribute the marijuana. The defendant's awareness of the existence of the conspiracy flows from his participation in the conspiracy to import such a large quantity, for in the absence of any legal market in which to dispose of his wares, there is no reason to import goods if there has been no plan made for their distribution." Id. at 752. "In summary, the fact that the defendant is involved in importing a huge quantity of marijuana into the United States may establish both the defendant's knowledge of and joinder in the conspiracy to possess with intent to distribute". Id. at 752.
 
 
 69
 A close examination of the Court's reasoning reveals a fundamental flaw. The Court has simply established that a person importing a large quantity of marijuana should be aware that the marijuana will be distributed once it reaches the United States. Unless awareness of this fact is equivalent to joining the conspiracy to distribute, there is still no evidence indicating the extent of the agreement entered into by the defendant crew member. Evidence that "someone must have an intent to distribute the marijuana" is a far cry from identifyingthe defendant as that someone. United States v. Laughman, 618 F.2d at 1074 n. 4.
 
 
 70
 Recognizing this problem, the Fifth Circuit invoked a long line of cases adhering to the proposition that intent to distribute may be inferred from the possession of a large quantity of marijuana. Id. at 755-756. The soundness of Michelena-Orovio, relied upon by the government in this case, thus rests on the validity of this inference. The inference that a person possessed of a large quantity of marijuana intends to distribute said marijuana is widely adhered to and well-recognized, but it is imperative to understand the context from which this inference originates. Invariably, every vessel case that cites this principle relies on cases which trace back to the situation where courts were distinguishing the mere possession of contraband from possession with intent to distribute.[41] It makes perfect sense to infer that persons possessed of a suitcase full of marijuana intend to distribute that marijuana rather than keep it to themselves because there is more marijuana than those persons could consume. See United States v. Johnson, 469 F.2d 973 (5th Cir.1972). This conclusion does not follow so surely when applied to infer that a crew member of a vessel conspired to distribute as well as import the marijuana. In the former context, the inference is relied upon to distinguish two choices where quantity is a relevant factor: mere possession from possession with intent to distribute. Whereas, in the latter context, the inference is relied upon to distinguish two choices where quantity is not a relevant factor: mere importation from importation and distribution. Assuming that joining a conspiracy to import is distinct from joining a conspiracy to distribute, and assuming that in any given case a defendant may have conspired to participate in one or the other or both, the quantity of marijuana smuggled provides no basis for identifying which of the foregoing conspiracies were joined unless it is presumed that one who conspires to import a large quantity of marijuana also conspires to distribute it. In other words, through circular reasoning, the presumption used to find the ultimate fact in question--whether one who conspires to import a large quantity of marijuana also conspires to distribute it--is the ultimate fact itself. This latter presumption is entirely different from the inference that one possessed of a large quantity of marijuana intends to distribute it, and the facts do not support its adoption.
 
 
 71
 Focus must be squarely placed on the quantity and what inferences really follow therefrom, and it must be remembered that the vast majority of conspiracy to import cases involve large quantities of marijuana. Again, the large quantity indicates that someone planned to distribute it, but not whether the defendant is that someone. The only difference a small quantity makes is that no one has plans to distribute it. Neither case presents a basis from which an inference can be drawn as to the general criminal intent and specific intent to distribute on the part of a particular crew member; the size of the cache alone cannot be sufficient to establish a crew member's intent and joinder in a conspiracy to distribute. See United States v. Boone, 641 F.2d 609, 611-612 (8th Cir.), cert. denied, 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981). The answer would be the opposite, of course, if one of the crew members possessed his own cache of marijuana. In that case, the crew member would be possessed of an amount such that it would be fair to infer an intent to both import and distribute--but that is not the situation here.
 
 
 72
 Accordingly, this Court is not prepared to reach as far as Michelena-Orovio. In Laughman, this Court held that the large quantity of marijuana sufficiently established that there was a conspiracy to distribute. United States v. Laughman, 618 F.2d at 1074 n. 4. "Simply proving the existence of a conspiracy, however, cannot sustain a verdict against an individual defendant. There must also be a showing of that defendant's knowledge of the conspiracy's purpose and some action indicating his participation." Id. at 1075. This principle was reaffirmed by this Court in United States v. Watkins, 662 F.2d at 1097. In neither of these cases was this Court content to rely on the quantity alone to infer the defendant's knowledge of and participation in the conspiracy. Even granting that the crew should have known someone was going to distribute the marijuana, "[m]ere knowledge, acquiescence or approval without cooperation or agreement to cooperate is not enough to constitute one part of a conspiracy." United States v. Mendez, 496 F.2d 128, 130 (5th Cir.1974).
 
 
 73
 Short of adopting the position that the act of unloading itself constitutes participation in the conspiracy to distribute, see United States v. Pool, 660 F.2d 547, 561 (5th Cir.1981), as opposed to merely a completion of the conspiracy to import, there is little evidence of the crew's joinder in the conspiracy to distribute. There is no evidence that the crew had any interest in or awareness of what plans, if any, were made to dispose of the marijuana once it reached shore. See United States v. Cadena, 585 F.2d at 1266. Likewise, "there is no evidence that would establish beyond a reasonable doubt that they would likely come in possession of the haul once it arrived, share in its proceeds thereafter, or other evidence from which it could be inferred that they were privy to plans to distribute the contraband." United States v. Rodriguez, 585 F.2d at 1247. "Proof of an agreement to enter into a conspiracy is not to be lightly inferred." United States v. Johnson, 439 F.2d 885, 888 (5th Cir.) cert. denied, 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161 (1971). Considered in a light most favorable to the government, we conclude that on the evidence presented no rational trier of fact could be convinced beyond a reasonable doubt that any of those on board the two vessels joined a conspiracy that went beyond importation to include the intent to distribute.[42] The convictions on Count Two as to those defendants are vacated and the indictments on this Count are dismissed as to the same. Due to the fact that this ruling is based on the insufficiency of the evidence, retrial on this Count is prohibited by the double jeopardy clause. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
 
 
 74
 Despite the Order of this Court to vacate the convictions of those on board the vessels, as to Count Two, there is no need to remand for resentencing since the punishment on this Count was to be served concurrent with the punishment imposed on Count One. United States v. McKinney, 477 F.2d 1184, 1186 (D.C.Cir.1973); see also United States v. Powell, 407 F.2d 582, 585 (4th Cir.), cert. denied, 395 U.S. 966, 89 S.Ct. 2113, 23 L.Ed.2d 753 (1969).
 
 VI
 
 75
 Defendant Gallopo is in a position somewhat different from the other defendants. Gallopo's claim is simply that he was not at Bennett's Point Landing that evening and he had nothing whatsoever to do with the alleged smuggling activities of his co-defendants. Gallopo urges this Court to find the evidence insufficient to support his convictions.
 
 
 76
 Gallopo was the only defendant who did not agree to a stipulated facts trial. He did agree, however, to adopt the record of the suppression hearing with the exception of the testimony of Bohanon and the statement of Michael. He also waived trial by jury.
 
 
 77
 At trial, the government's evidence against Gallopo came from Bohanon and Michael. Bohanon testified that he met Gallopo on the evening of November 28, 1980, at Bennett's Point Landing, where they waited for the vessels to show. Bohanon tentatively identified Gallopo at trial, but admitted that he could not be absolutely sure. Michael also testified that he saw Gallopo at Bennett's Point Landing that evening, and he made a positive identification of Gallopo. Both Bohanon and Michael testified that Gallopo was the driver of a third tractor-trailer.
 
 
 78
 Gallopo admits that he was in Walterboro on the evening in question, but claims that he was hauling citrus fruit and had to stop in Walterboro because of mechanical problems with the refrigeration unit in his trailer. In his defense, Gallopo points out that the officers at Bennett's Point Landing found only two tractor-trailers. Gallopo also emphasizes that Bohanon was less than sure in his identification, and Michael was a witness with a stake in the proceedings and possessed a motive to fabricate testimony. Several witnesses gave testimony on behalf of Gallopo, most of whom were employees at the Howard Johnson where Gallopo stayed while in Walterboro. These witnesses merely corroborated that Gallopo stayed at the Howard Johnson and that he made no effort to hide his identity. A witness also testified that he sold Gallopo a replacement part needed to repair the refrigeration unit on the trailer.
 
 
 79
 Gallopo argues that the weight of the evidence against the already suspect testimony of Bohanon and Michael is overwhelming. As support for his position, Gallopo submits excerpts of statements made by the trial court expressing concern about the strength of the government's case.
 
 
 80
 Although much of the government's case against Gallopo is based on the testimony of two admitted accomplices, the law in this Circuit is well settled that uncorroborated testimony of an accomplice may be sufficient to sustain a conviction. United States v. Figurski, 545 F.2d 389, 392 (4th Cir.1976); United States v. Clark, 541 F.2d 1016, 1018 (4th Cir.1976); United States v. Miller, 451 F.2d 1306, 1307 (4th Cir.1971). Even so, the evidence against Gallopo was not uncorroborated. Despite his claimed innocence and unrelated presence in Walterboro, a red pad was found in the brown van with a notation which read "Gary Gallopo," and beneath it, "HJ 101." Not surprisingly, the evidence also shows that Gallopo was registered to Room 101.
 
 
 81
 It is axiomatic that it is the role of the factfinder, not the appellate court, to resolve conflicts in testimony, weigh the evidence, and judge the credibility of witnesses. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982); United States v. Fisher, 484 F.2d 868, 869-70 (4th Cir.1973), cert. denied, 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974), citing Glasser v. United States, 315 U.S. at 80, 62 S.Ct. at 469. The fact that the trial court first expressed concern, but later had "no difficulty in concluding that the government [had] proven its case against Gary Gallopo beyond a reasonable doubt," Manbeck, 526 F.Supp. at 1116, is merely an indication that Judge Hawkins carefully considered the evidence before rendering his decision. Viewed in the light most favorable to the government, we find the evidence sufficient to sustain convictions of Gallopo on all counts.
 
 VII
 
 82
 Therefore, consistent with the foregoing discussion, the decision of the trial court is REVERSED in part as to the standing of defendants where indicated; the convictions under Count Two of defendants arrested on board the vessels are VACATED; and the judgment is AFFIRMED in all other respects.
 
 
 83
 AFFIRMED IN PART; VACATED AND REVERSED IN PART.
 
 
 84
 DONALD RUSSELL, Circuit Judge, concurring in part and dissenting in part:
 
 
 85
 I concur in the recitation of the facts of this complex case, as well as in Parts I, II, III, IV, V(A), and VI of the majority opinion. I cannot agree, however, with the reasoning which leads the majority to conclude that the evidence was insufficient to support the conspiracy convictions on Count Two for possession of marijuana with intent to distribute. I therefore dissent from Part V(B) of the majority's opinion, and the portion of the judgment vacating the defendants' convictions under 21 U.S.C. Sec. 846.
 
 
 86
 The crucial issue in these cases is whether the sea-based defendants could be found to have had the requisite intent to distribute the marijuana they possessed, on the basis of the vast size of the cache, some 59,000 pounds. This is not a case where any members of the crews of the shrimp boats might have been unaware of their cargo; the majority recognizes that this is "extremely unlikely," and the evidence established that all defendants on the boats played an affirmative role in the conspiracy to import. Common sense demonstrates that the defendants could not, by the most strenuous efforts, have possibly consumed nearly 30 tons of marijuana personally. From the indisputable premises that 1) defendants possessed the marijuana, and 2) the marijuana had to be distributed, could not a rational trier of fact have concluded that defendants intended to distribute the marijuana?
 
 
 87
 The majority assumes that the sea-based defendants would have needed an intent to take some personal role in the distribution on shore to be convicted on Count Two. The flaw in this reasoning is that the defendants were not charged individually with an intent to distribute, but with participation in a conspiracy to distribute. The majority agrees that the two conspiracies charged arose from a "single continuous transaction," and so are properly treated not as distinct enterprises, but rather as "a single conspiracy with dual criminal objectives." The sea-based defendants possessed a substantial quantity of marijuana which they transferred to their land-based cohorts, who are beyond dispute subject to conviction for possession with intent to distribute. Under settled law, acts of any conspirators in furtherance of a conspiracy may be attributed to all participants, Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946), and therefore the sea-based defendants may be treated as participants in the entire course of the smuggling operation up to its interception by law enforcement authorities if their intent to distribute can be established at any point, absent evidence of subsequent withdrawal from the conspiracy. I would follow the Fifth Circuit's recent en banc decision in United States v. Michelena-Orovio, 719 F.2d 738 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984), which recognized that conspiracies to smuggle illegal drugs are not to be artificially severed into several stages, but in reality are an interconnected whole. 719 F.2d at 746. See also United States v. Martino, 664 F.2d 860, 876 (2d Cir.1981), cert. denied, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). The facts establishing an interconnected distribution chain are more compelling here than in Michelena-Orovio, where the defendant was a Colombian seaman apprehended by the Coast Guard on a converted shrimp boat at sea laden with twelve tons of marijuana. These defendants are not foreigners, and they actually brought the marijuana to United States shores and participated in the offloading.
 
 
 88
 The majority's unwillingness to infer intent to distribute from possession of a quantity of drugs vastly greater than could be personally consumed stands in contrast to the numerous decisions of other circuits involving drug smuggling by vessel which have not hesitated to make that inference. See, e.g. Michelena-Orovio, 719 F.2d 738, 752; United States v. Ceballos, 706 F.2d 1198, 1202 (11th Cir.1983); United States v. Smith, 680 F.2d 255, 260-61 (1st Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); United States v. Allen, 675 F.2d 1373, 1384 (9th Cir.1980), cert. denied, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981). Indeed, we have previously recognized that intent to distribute may be established by possession of two tons of marijuana. United States v. Laughman, 618 F.2d 1067, 1074-75 n. 7 (4th Cir.), cert. denied, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Laughman states that an individual defendant must be shown to have known of the conspiracy's purpose and to have taken some action indicating his participation. 618 F.2d at 1075. Those prerequisites, in my view, are met here by the sea-based defendants' obvious realization that the marijuana was to be distributed, and by their possession of the marijuana and transfer of it to the land-based defendants who were to perform the actual distribution. See also United States v. Watkins, 662 F.2d 1090, 1097-98 (4th Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982), which treated the quantity of marijuana involved as relevant to possession with intent to distribute.
 
 
 89
 For the reasons stated, I would affirm the convictions of the defendants for possession of marijuana with intent to distribute on Count Two, as well as affirming the defendants' remaining convictions.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Defendants' proof of discrimination was based on a study of nine grand juries selected in an eight year span from 1974-1981. Of those nine grand juries, no blacks or women were chosen as forepersons, and only three women were appointed deputy forepersons. While the Court expressed "serious doubts" as to the validity of conclusions that may be drawn from only nine grand juries, it nevertheless assumed that this constituted a "significant period" for the purpose of establishing a discriminatory practice. United States v. Manbeck, 514 F.Supp. at 148 n. 10. The trial court found that women and blacks were distinct and identifiable classes; that the selection procedure for forepersons was susceptible to discriminatory application; and that there was underrepresentation for a significant period of time. Id
 
 
 [2]
 Once a prima facie case of discrimination is established the burden shifts to the government to show an absence of discriminatory intent. Duren v. Missouri, 439 U.S. 357, 368, 99 S.Ct. 664, 670, 58 L.Ed.2d 579 (1979); Rose v. Mitchell, 443 U.S. 545, 565, 99 S.Ct. 2993, 3004, 61 L.Ed.2d 739 (1979). In fulfilling this burden the government relied solely upon the testimony of two judges who presided over three of the nine grand juries implicated, Judge Robert W. Hemphill and Judge Robert F. Chapman. Both judges recited the various criteria used by them for the selection of forepersons, that included, inter alia, the age, employment, education and leadership capacity of the jurors; and both judges denied that sex or race was ever considered against prospective grand jury forepersons. Although the Supreme Court has expressed concern that "simple protestations" may not be sufficient to rebut the presumption of discrimination, see Castaneda v. Partida, 430 U.S. 482, 498 n. 19, 97 S.Ct. 1272, 1282 n. 19, 51 L.Ed.2d 498 (1977), consistent with our resolution of this issue, this Court makes no finding as to either the prima facie showing of discrimination or the sufficiency of the rebuttal evidence
 
 
 [3]
 Code of South Carolina Laws Sec. 44-53-410 (1976) provides as follows:
 If a violation of this article is a violation of a federal law or the law of another state, the conviction or acquittal under the federal law or the law of another state for the same act is a bar to prosecution in this state.
 
 
 [4]
 Count Four of the indictment was not dismissed as to defendant Gallopo, and he does not join in this issue
 
 
 [5]
 Dismissal in this case was sought by the government and granted by the trial court under the authority of Federal Rules of Criminal Procedure Rule 48(a), which reads: "The Attorney General or the United States Attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such dismissal may not be filed during the trial without the consent of the defendant."
 
 
 [6]
 While the Supreme Court has never authoritatively stated what "leave of court" was intended to encompass, the Court has endorsed the "public interest" consideration set out in Cowan. See Rinaldi v. United States, 434 U.S. 22, 29-30, 98 S.Ct. 81, 85-86, 54 L.Ed.2d 207 (1977). In addition, the Court did state that "[t]he principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, e.g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendants' objection." (citations omitted) Id. at 29 n. 15, 98 S.Ct. at 85 n. 15
 
 
 [7]
 The Supreme Court has made it clear that the double jeopardy clause does not prohibit state and federal authorities from each prosecuting a defendant for the same act. Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); See also Rinaldi v. United States, 434 U.S. at 28, 98 S.Ct. at 84. Thus defendants must rely upon other sources to show that dismissal here was against public policy. In addition to the South Carolina Code provision, defendants raise the Petite policy followed by the Justice Department with regard to duplicative state and federal charges. The Petite policy is an internal rule promulgated by the Justice Department that requires prior approval from a supervising Assistant Attorney General before a federal prosecution may follow a state prosecution for the same act, or acts. See Rinaldi v. United States, 434 U.S. at 24, 98 S.Ct. at 82. The Petite policy was not directly implicated in this case since no state prosecution preceded the federal action. See also United States v. Hadley, 671 F.2d 1112, 1116 (8th Cir.1982) (Petite policy is an internal rule that does not confer any substantive rights of enforcement on the defendants)
 
 
 [8]
 The second sentence in Fed.R.Crim.P. Rule 48(a) states: "Such a dismissal may not be filed during the trial without the consent of the defendant."
 
 
 [9]
 It must also be remembered that only South Carolina tried defendants for a crime of distribution of marijuana. Technically speaking, then, defendants were not successively tried for the same crimes. However, the South Carolina statute speaks in terms of "same act", not "same crime." See supra, note 3
 
 
 [10]
 In fact, evidence that this procedure did not violate South Carolina public policy against successive prosecutions comes from the fact that defendants were ultimately indicted and sentenced on a charge of intent to distribute marijuana in South Carolina. If defendants argument is correct, presumably, South Carolina authorities would have been precluded from bringing the subsequent charges
 
 
 [11]
 Other courts have refused to second-guess the Justice Department's application of its Petite policy, "[i]t might be otherwise if the Attorney General's policy were something more than in-house rules, and had reached the stage of publication in the Code of Federal Regulations or some equivalent publication." United States v. Chavez, 566 F.2d 81 (9th Cir.1977). "We will not interfere with the Attorney General's prosecutorial discretion unless it is abused to such an extent as to be arbitrary and capricious and violative of due process." United States v. Welch, 572 F.2d 1359, 1360 (9th Cir.) cert. denied, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978)
 
 
 [12]
 For the purposes of this analysis, this Court will assume that a trial has begun within the meaning of Rule 48(a) when jeopardy attaches to the proceedings. See generally, United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)
 
 
 [13]
 Defendants claim that they waived the right to a jury trial because of an agreement that limited their maximum exposure to 10 years imprisonment if convicted. Permitting state prosecution would thus result in potentially greater penalties than the agreement specified. In response to these objections, the trial court voided defendants' waivers and scheduled the beginning of jury selection procedures. Defendants then rewaived their right to a jury trial, and preserved their objections to the government's requested dismissal. This sequence of events precludes defendants from linking their agreement to stipulate the facts to the Government's disposition of Count Four
 Courts have held that under 48(a) a count may be dismissed from an indictment without destroying the entire indictment or affecting other charges contained therein. See United States v. Delagarza, 650 F.2d 1166, 1167 (10th Cir.) cert. denied, 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981). Thus, even if the dismissal was in error it would have no impact on the validity of the counts on which defendants were actually tried.
 Defendants' proper remedy, if any was merited, would have been to challenge the institution of state charges on the distribution of marijuana.
 
 
 [14]
 This error was made in favor of defendants and causes them no prejudice. See Street v. Surdyka, 492 F.2d 368 (4th Cir.1974) (cannot complain where error in favor of appellant). Nevertheless, this Court feels compelled to address this issue in order to avoid an unwarranted extension of the rules on standing
 
 
 [15]
 In Salvucci, the Supreme Court unequivocally establishes this very proposition: "We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." 448 U.S. at 92, 100 S.Ct. at 2553
 
 
 [16]
 Furthermore, there is some doubt concerning the extent to which one may claim a property interest in contraband, the possession of which is per se illegal. See United States v. Parks, 684 F.2d 1078, 1083 n. 7 (5th Cir.1982). But see United States v. Jeffers, 342 U.S. 48, 52-54, 72 S.Ct. 93, 95-96, 96 L.Ed. 59 (1952) (While there are no property rights in contraband, the contraband is still property for the purposes of the exclusionary rule.) Defendants' claimed interest in this case is even more tenuous than a possessory interest in the marijuana. Here, defendants claim an undivided interest in the profits to be made from the sale of the marijuana. Thus, defendants base their standing on an unenforceable, incorporeal interest in the prospective gains from an illegal venture
 
 
 [17]
 Where a constitutional violation is alleged, the party claiming this violation carries the burden to establish the standing required to raise that claim. Rakas v. Illinois, 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1; United States v. Dickerson, 655 F.2d 559, 561 (4th Cir.1981)
 
 
 [18]
 Law enforcement officers may stop moving vehicles with less than probable cause where they have objective facts that support an articulable and reasonable suspicion that the vehicle or any of its occupants is subject to seizure for violation of law. Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); see also United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). There is ample articulable support for a reasonable suspicion justifying the initial stop, specifically: the anonymous tip that marijuana was being loaded at Bennett's Point Landing; the subsequent observation of the tractor-trailer with Georgia plates at Bennett's Point; the movement of the tractor-trailer at night; the reputation of the area as a place used to smuggle illegal drugs; and, the fact that the officers had never seen a tractor-trailer in the area before the night in question. See United States v. Manbeck, 526 F.Supp. at 1103. Defendants do not seriously contest that these facts are sufficient to provide the officers with a reasonable suspicion of illegal activity
 
 
 [19]
 It is by no means certain that the brevity limitation of Terry and Sharpe was, in fact, exceeded in this case by the hour-long detention. Relying heavily on Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), this Court emphasized in Sharpe that investigatory stops must be brief. However, Sharpe stopped short of delimiting brevity by adopting some arbitrary bright-line time span. United States v. Poole, 718 F.2d 671 (4th Cir.1983). Brevity can only be defined in the context of each particular case. See United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983) ("Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.") Interpreting the brevity requirement, the Supreme Court emphasized that "[i]f the purpose underlying a Terry stop--investigating possible criminal activity--is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in Terry and Adams [v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612]." Michigan v. Summers, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981). Thus, an investigatory stop may be characterized as brief if the investigation into the reasonable suspicions that provided the basis for the stop is diligently pursued by the officers, and as long as the stop is not a pretext for an illegal de facto arrest as in Dunaway. See United States v. Place, 103 S.Ct. at 2645. Because this court finds that, in any event, probable cause arose early on in this case, there is no need to decide whether the almost hour-long detention of Brogden violated the brevity requirement
 
 
 [20]
 Officer Canady testified during the suppression hearing that:
 We asked him where his truck was parked, and he told us where he had his truck parked, which was not where we had observed the truck. We asked him when he had loaded out of Charleston, and he told us a couple of days before is when he actually loaded, and we asked why it took two days to get there, and he said he had been sick at a motel room.
 Record, Vol. XXIV, at 41.
 
 
 [21]
 There is no allegation that Sheriff Seigler was dilatory in his efforts to ascertain the existence of "Central Soya", or in his efforts to convey his findings to the officers on the scene
 
 
 [22]
 Although there is a distinction between the length of a detention and the quality of a detention when finding a de facto arrest, their inquiries often overlap. For example, in Dunaway v. New York, supra, the court took the length of the detention into account when finding that the seizure was in the nature of an arrest
 
 
 [23]
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)
 
 
 [24]
 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)
 
 
 [25]
 Defendants submit that because one of the officers admitted Brogden was not free to leave, he was effectively under arrest. The expressed intentions of the officer is not controlling on whether Brogden was in fact arrested. As was discussed earlier, a Terry stop authorizes temporary detentions, so this statement alone provides no basis for a distinction between a Terry stop and an arrest. Furthermore, this Court recently considered a more affirmative statement made by an officer. "The minute I stopped that car he was under arrest," and, finding no arrest had occurred, held that statement of intent merely a factor to be considered. United States v. Perate, supra
 
 
 [26]
 Compare the analysis in this case with that of the Ninth Circuit in United States v. Chamberlin, 644 F.2d 1262 (9th Cir.1980) cert. denied, 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). In Chamberlin, the Ninth Circuit held that the placing of a suspect in the back of a police car for twenty minutes while the officer pursued another suspect exceeded the limits of a Terry stop. The court reached this conclusion, relying largely on Dunaway, because it refused to adopt a balancing approach and did not take into account the exigencies of the circumstances. However, subsequent to both Dunaway and Chamberlin, the Supreme Court has expressly allowed a "balancing of the competing interests to determine the reasonableness of the type of seizure involved." Florida v. Royer, 103 S.Ct. at 1325. For these reasons, this Court does not feel its analysis is directly contrary to that of the Ninth Circuit
 
 
 [27]
 See also, Michigan v. Summers, 452 U.S. at 702-703, 101 S.Ct. at 2594 (three law enforcement interests justifying detention are "preventing flight in the event that incriminating evidence is found," "minimizing the risk of harm to the officers" and "orderly completion of the search"). All three of the interests described in Summers were to some extent motivating factors for the officers in the case at hand
 
 
 [28]
 The trial court held that only Brogden had standing to raise this objection because the right against self-incrimination is personal and may not be vicariously asserted, citing United States v. Dowdy, 486 F.2d 1042, 1043 (5th Cir.1973) cert. denied, 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 888 (1974); Hall v. United States, 413 F.2d 45, 48 (5th Cir.1969). Defendants have not specifically appealed this determination and, in any event, the Fifth Amendment claim is ultimately resolved against Brogden. Therefore, this Court ventures no opinion on whether defendants have standing to claim an alleged violation of Brogden's Fifth Amendment rights. Nevertheless, this Court does note in passing that the few cases discussing this issue support the conclusion of the trial court. See United States v. Fredericks, 586 F.2d 470, 480-481 (5th Cir.1978), cert. denied, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); Bryson v. United States, 419 F.2d 695, 698-699 (D.C.Cir.1969); United States v. Hensel, 509 F.Supp. 1376, 1384-1385 (D.Me.1981); affirmed, 699 F.2d 18 (1st Cir.1983)
 
 
 [29]
 Of course, Miranda concerns aside, "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." Florida v. Royer, 103 S.Ct. at 1326 (citations omitted). See also, Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). This Court has found that the nature of Brogden's detention was not illegal and that probable cause arose before the length of the detention would have rendered it illegal. Therefore, the statements were not given during a period of illegal detention and the concerns expressed in Royer need not be addressed
 
 
 [30]
 See also California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 3519-3520, 77 L.Ed.2d 1275 (1983) ("Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for the purposes of receiving of Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.") (citation omitted)
 Again, there are two types of seizures, one a permissible investigative stop, the second a detention equivalent to arrest. The Supreme Court has implied that custodial interrogations and Terry stops are mutually exclusive, i.e., if one is interrogated in a custodial situation the limits of Terry have necessarily been exceeded. See Dunaway v. New York, 442 U.S. at 216, 99 S.Ct. at 2258 ("These passages from Davis and Brown reflect the conclusion that detention for custodial interrogation--regardless of its label--intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.") The type of "seizure" that is similar to "custody", then, is seizure equivalent to arrest. Also, if this Court were to find that Brogden was subjected to custodial interrogation, which we emphatically do not, then we could not have concluded, as we did, that Brogden's detention was a proper Terry stop.
 
 
 [31]
 In United States v. Seni, 662 F.2d at 281, this Court stated that the use of handcuffs does not establish involuntariness. Here, the officers did not even go that far
 
 
 [32]
 See Moore v. Ballone, 658 F.2d at 227 (Fourth Circuit adopts th eobjective standard for whether one is in custody for the purposes of Miranda )
 
 
 [33]
 In addition to finding that Brogden was not in custody, the trial court also found that he was not subjected to interrogation. United States v. Manbeck, 526 F.Supp. at 1104-1105. Miranda specifically linked "interrogation" to the status of custody, "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. Subsequent Supreme Court decisions have "stressed that it was the custodial nature of the interrogation which triggered the necessity of its Miranda holding." Beckwith v. United States, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976) (citations omitted) (emphasis in original). Since this Court has found that Brogden was not in custody amounting to an arrest, and that the coercive aspects of his detention did not rise to the level of custody sufficient to trigger the need for a Miranda warning, it is not necessary to examine whether Brogden's statements were given in response to an "interrogation". However, it is informative to note that " 'interrogation', as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)
 
 
 [34]
 As a consequence of upholding the validity of the prolonged detention of Brogden, it follows that the discovery of the odor of marijuana itself was not tainted. In the absence of any illegality, the officers were fully entitled to examine the exterior of the tractor-trailer in the course of their investigation. A strong, emanating odor of marijuana comes within the "plain view" doctrine and need not be ignored by officers. See United States v. Haynie, 637 F.2d 227, 233 (4th Cir.1980), cert. denied sub nom., Fletcher v. United States, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 351 (1981); United States v. Sifuentes, 504 F.2d 845, 848 (4th Cir.1974)
 
 
 [35]
 The government argues that the respective captains consented to follow the Customs officers back to Bennett's Point Landing, and defendants should therefore not be allowed to contest the validity of that action. The trial court made no mention of a consent, and this Court declines to do so in the absence thereof
 
 
 [36]
 Defendants also argue that the presence of local law enforcement officers and the fact that these officers participated in the boarding exceeded the authority granted to Customs Officers under 1581(a). This argument has already been addressed and refuted by the Supreme Court:
 "Respondents however contend in the alternative that because the Customs Officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marijuana, they may not rely on the statute authorizing boarding for inspection of the vessel's documentation. This line of reasoning was rejected in a similar situation in Scott v. United States (citation omitted), and we again reject it. Acceptance of respondent's argument would lead to the incongruous result criticized by Judge Campbell in his opinion in United States v. Arra [630 F.2d 836 (1st Cir.1980) ] (citation omitted): 'We see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers.' "
 United States v. Vilamontez-Marquez, 103 S.Ct. at 2577 n. 3.
 
 
 [37]
 The trial court held that the captains could not claim a privacy interest in the fishhold area of the vessels. United States v. Manbeck, 526 F.Supp. at 1102. Thus, Customs officials were entitled to enter the fishhold area while conducting their investigatory stop without infringing on Fourth Amendment interests. See United States v. Freeman, 660 F.2d 1030, 1034 (5th Cir.1981), cert. denied, 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); United States v. Willis, 639 F.2d 1335, 1337 (5th Cir.1981). This Court agrees with the trial court's determination. However, the issue has not been specifically addressed because this Court has found, as did the trial court, that in any event probable cause for a search arose before the fishhold area was entered
 
 
 [38]
 The land based defendants who received the marijuana will largely be ignored in the following discussion because it is well settled that they may be held responsible for both importation and distribution by virtue of their participation. The treatment of crew members is less clear. Thus, the trial court's opinion sufficiently addresses the former group and nothing need be added by this Court. Defendant Gallopo, because of his different position, will be addressed separately in Section VI
 
 
 [39]
 Defendants argue that the testimony of a co-conspirator is insufficient to support their conviction. This objection is meritless. Other courts have held that the testimony of a co-conspirator may be relied upon to support a conviction. See, e.g., United States v. Scholle, 553 F.2d 1109 (8th Cir.) cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Moreover, in this case, the government has introduced considerable evidence corroborative of Michael's and Bohanon's testimony
 
 
 [40]
 The sentences imposed on defendants on Counts One and Two ran concurrently with another. Under the "concurrent sentence doctrine," where one of the convictions is affirmed both may be upheld without a review of the second. United States v. Walker, 677 F.2d 1014 (4th Cir.1982); United States v. Webster, 639 F.2d 174 (4th Cir.) cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); see also Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); but see United States v. DeBright, 730 F.2d 1255 (9th Cir.1984) (en banc) (repudiates concurrent sentence doctrine, raising question as to its continued vitality). The government has not asked this Court to invoke the "concurrent sentence doctrine", but the power is one that resides in the Court and may be exercised if it is deemed appropriate without regard to request by the parties. This Court chooses, however, to review the sufficiency of the evidence as to Count Two due to the significance of the issue, and, more important, because the conspiracy to distribute conviction poses a substantial risk of adverse consequences to defendants. Courts have held that where such risk exists, it would be inappropriate to avoid reviewing the conviction. See United States v. Walker, 677 F.2d at 1016; United States v. Webster, 639 F.2d at 183. Cognizable consequences include possible stigma, Id. at 183, and impact on release dates. United States v. Walker, 677 F.2d at 1016. This Court cannot conclude that the conviction of defendants on the charge of conspiracy to possess marijuana with intent to distribute exposed them to no risk of adverse consequences
 
 
 [41]
 For example, Michelena-Orovio cites United States v. Ceballos, 706 F.2d 1198, 1201-1203 (11th Cir.1983), for the proposition that intent to distribute may be inferred from the size of the cache. Itself a vessel case, Ceballos cites, among other, United States v. Shelnut, 625 F.2d 59, 62 (5th Cir.1980), cert. denied, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981), also a vessel case, for the same proposition. Shelnut cites United States v. Love, 599 F.2d 107, 109 (5th Cir.) cert. denied, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979), in support. Love, in contrast to the previous cases, was not a vessel case; it was a situation where the defendant's van was filled with marijuana, and the inference was used to distinguish mere possession from possession with intent to distribute. Love cites United States v. Johnson, 469 F.2d 973 (5th Cir.1972), for the proposition that possession of a large quantity supports an inference of intent to distribute. Johnson involved a situation where the defendant's footlocker was loaded with marijuana. Again, the inference was used to distinguish between mere possession and possession with intent to distribute. Finally, Johnson cites United States v. Ortiz, 445 F.2d 1100, 1104-1105 (10th Cir.) cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971), for the same proposition. In fact, a vast majority of cases that support the inference of intent to distribute from quantity can ultimately be linked to Ortiz, or a similar case, United States v. Cerrito, 413 F.2d 1270 (7th Cir.1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970)
 In Ortiz, the court arrived at the inference by the following reasoning:
 There was no proof of an actual sale by Ortiz, so admittedly the sufficiency of the evidence in this respect rises or falls on whether the two containers of metaphetamine were of such quantity that it is proper to conclude that Ortiz was going to sell, deliver or dispose of the speed to another rather than keep it for himself. Case law is practically non-existent on this proposition.... The legislative history of the statutory proposition against trafficking in drugs reveals that Congress believed that the quantity of drugs found in the possession of a person should bear directly upon the question of whether or not his possession is for his own use or is for the purpose of illicit transactions involving others. (citations omitted)
 United States v. Ortiz, 445 F.2d at 1104-1105. (emphasis added).
 
 
 [42]
 There is some question as to whether the captain of a ship is in a position different from that of his crew with respect to a conspiracy to distribute. It is definitely conceivable that a captain would join a conspiracy to distribute in circumstances where the crew does not. For example, if it is shown that the captain had an ongoing relationship with those involved in the distribution scheme, whereas, in contrast, crew members were merely hired on a trip-by-trip basis, a strong inference can be drawn that the captain participates and has a stake in the overall conspiracy to distribute, while the crew does not. Or, if the captain was paid in an amount or manner that depended upon the successful outcome of the distribution scheme, while the crew received a flat rate upon completion of the act of importation, again, a distinction could be drawn between the captain and crew as to the extent and object of the conspiracies joined by each. A number of similar distinctions between a captain and the crew can be posited, however, no such evidence was presented in this case, and we are therefore precluded from considering guilt of the captain on such grounds